UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

Civil No. 2:26-cv-__________

| | |
|---|---|
| MR. and MS. DOE, individually and on behalf of JOHN DOE, | ) |
| Plaintiffs, | ) |
| v. | ) |
| GORHAM SCHOOL DISTRICT, | ) |
| Defendant. | ) |

**COMPLAINT**

Plaintiffs, Mr. and Ms. Doe, individually and as the parents and guardians of their son, John Doe, complain against the Gorham School District as follows:

**PARTIES AND JURISDICTION**

1. This is an action commenced under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.,* supplemented by Maine's laws regarding the education of exceptional students, 20-A M.R.S.A. § 7001, *et seq.*, and their respective implementing regulations.

2. Plaintiffs Mr. and Ms. Doe, and their son, John Doe, are residents of Gorham, Maine.

3. John is currently enrolled at Align Adolescent Recovery ("Align") and San Pedro Valley Academy ("SPVA"), a therapeutic boarding school in Huachuca City, Arizona, where he was unilaterally placed by his parents on January 9, 2026.

4. Defendant Gorham School District ("Gorham") is the local education agency responsible for providing a free appropriate education to students with disabilities who are residents of Gorham.

5. This action seeks judicial review of an erroneous administrative decision issued on August 21, 2026, by a Maine Department of Education hearing officer pursuant to the IDEA, 20 U.S.C. § 1415(i)(2). This action also challenges the hearing officer's entry of four legally erroneous prehearing orders, identified below, which were consequential to the final outcome. Following entry of the unlawful prehearing orders and a five-day hearing, the hearing officer erroneously ruled on the merits that (i) Gorham did not violate its Child Find obligations under the IDEA to evaluate, identify, and provide specialized programming for John; (ii) Gorham's obligation to evaluate John was excused pursuant to 34 C.F.R. § 300.301(d)(1); and (iii) Gorham has no responsibility for any costs incurred by the Does for John's unilateral placement at Align/SPVA, in part because the hearing officer committed legal error in concluding that this placement is not appropriate for John.

6. In seeking to reverse the hearing officer's orders under the IDEA, Plaintiffs are parties "aggrieved by the findings and decision" of a due process hearing officer within the meaning of the IDEA, 20 U.S.C. § 1415(i)(2)(A).

7. This Court's subject matter jurisdiction is based upon the IDEA, 20 U.S.C. §§ 1415(i)(2)(A), 1415(i)(3)(A)–(C), and 28 U.S.C. § 1331 (federal question jurisdiction).

## FACTS COMMON TO ALL COUNTS

8. John Doe is a 17-year-old student who is currently in the twelfth grade. Despite John's mental health and attentional disabilities, Gorham never initiated a referral for special education evaluation on its own, never completed the initial evaluation initiated by the Does' December 2025 referral request, and never determined whether John is eligible for special education and related services under the IDEA.

9. John attended the Great Falls Elementary School in Gorham beginning in first grade.

10. John was a solid student during elementary school, but there were signs that he had issues with attention and impulsivity, poor organization and planning skills, and a propensity for movement and high-risk sports.

11. The COVID-19 lockdown occurred in March 2020, when John was completing fifth grade. For 2020-2021, he attended sixth grade in a hybrid program through Gorham Middle School ("GMS"), with three days per week of remote instruction. John struggled with virtual learning due to his short attention span and distractibility; his near-constant need to be in motion; his difficulty with task initiation and follow-through; and his poor organization and planning skills, which led to procrastination and work avoidance. John demonstrated significant difficulty starting and completing independent academic work. His mother had to sit with John, develop checklists for him, monitor him constantly, provide frequent

reminders, and take steps to keep him from becoming overwhelmed and giving up, so he could complete sixth grade successfully.

12. John experienced behavioral issues in seventh grade (2021-2022). His seventh-grade teachers contacted his parents regularly about his disruptive and disrespectful behavior and his inability to complete his schoolwork. John's parents responded appropriately by trying to assist him and by attending all parent-teacher conferences. They monitored the school's online portal and exchanged e-mails with teachers about John's behavior and work habits.

13. In October 2021, John made "rude, sarcastic comments" about a peer's project, resulting in discipline. Then in December 2021, John wrote an e-mail apologizing to his Spanish teacher about "how rude I've been" and asking to "move desks until I can pull myself together." The following month, John corresponded with his social studies teacher about his incomplete work, commenting: "I deleted most of my work because I wasn't really paying attention and was confused on what the Intolerable Acts were."

14. In January 2022, John corresponded with his Spanish teacher, explaining that he repeatedly lost or forgot the organizational checklist intended to assist him. His teacher acknowledged these difficulties and discussed additional organizational assistance, including daily check-ins and reminders. She also shared John's concerns with other teachers, expressing her belief that he might benefit from additional or different academic support.

15. That same month, John's social studies teacher e-mailed him about how he was falling behind and his need to complete his academic work. John's parents tried their utmost to help John stay organized and on top of his assignments, and to complete his work, but he often rebuffed their assistance and reacted negatively.

16. Despite observing John's persistent difficulties with attention, organization, task initiation, work completion, and classroom behavior, and their awareness of the ineffectiveness of ordinary academic supports, no GMS staff member referred him for an evaluation under the IDEA. John's difficulties were subsequently identified in a neuropsychological evaluation as consistent with ADHD and executive-functioning impairments.

17. In February 2022, John's band teacher met with his parents to discuss his chronic inability to complete homework. John's work was late or missing in most of his classes, which required his parents to assist him at home to catch up. Unfortunately, his classroom behaviors and his inability to complete work independently did not improve during the rest of seventh grade.

18. John returned to GMS for eighth grade (2022-2023). Although GMS staff had provided some general education interventions, Gorham had not evaluated John to determine whether his persistent academic, organizational, and behavioral difficulties were attributable to a disability requiring special education. With no formal plan in place to address his disability-related difficulties in completing his work, John continued to struggle with academic expectations. His parents continued to provide assistance, making it their practice to check in with him

frequently in an attempt to keep him engaged with his assignments. As eighth grade progressed, however, John's experience left them feeling defeated as parents.

19. GMS's discipline log lists an incident in October 2022 in which John yelled at a teacher and was disciplined for defiant and disrespectful conduct. A week later, he received a detention for "very inappropriate gestures" in class.

20. A teacher's email in October 2022 told John: "I am sorry that you gave me such a hard time when I delivered the message that you needed to go back down to the office. Next time I will just say that it is because you don't know how to behave at school and that your parents are headed to school to meet with you and the assistant principal." That same month, John emailed another teacher apologizing "for the way I acted in class today," calling his behavior "very inappropriate."

21. John's "Intervention Log" for October 2022 reports there had been "[m]ultiple office notes on behaviors." It specifies: "All teachers have called mom. Social gestures. Teachers tell him to take a walk—denies the foolishness. Not improving—even with intervention." Despite John's continuing academic and organizational struggles, and Gorham's contemporaneous documentation that his behavioral difficulties persisted and were not improving with intervention, Gorham did not refer him for an evaluation to determine whether he had a disability requiring special education. The record also provides no documentation that any attempted general education interventions produced meaningful improvement or that Gorham adequately investigated whether John's persistent difficulties reflected an underlying disability.

22. John's parents met repeatedly with one of John's eighth grade teachers in an attempt to help their son succeed. Following a November 2022 meeting with John's parents concerning his continuing difficulties, the teacher communicated with the GMS social worker regarding John. Despite the involvement of multiple teachers, repeated parental communications, and consultation with school support personnel, Gorham still did not initiate a special education evaluation to determine whether John's persistent difficulties reflected an underlying disability.

23. John's English Language Arts teacher complained that "behaviorally, there's been a bit of an uptick in inappropriate/distracting comments, and he is reluctant to be redirected." John's parents tried to get advice about helping him with work over the Thanksgiving break. "We are continuing not to allow him to take his phone or EarPods to school and will continue to enforce these restrictions until we have a consistent demonstration of behavior."

24. In December 2022, John's father again emailed John's teacher seeking information about whether John was meeting with a guidance counselor. He inquired about options for getting "additional help" for John: "I am curious why [John] is still not able to take ownership of writing down what work he has to complete. . . . On the topic of quality, [John] still doesn't seem to care what he turns in. To me, it feels very much like a 'check the box' exercise. Especially with ELA and Math. I have tried to talk to him and I am putting my 'foot down' which almost always results in a massive argument. . . . [T]his is an indicator that he may need additional help and that 'not caring' may be his defense mechanism on the subject.

What can we do to pursue additional help in ELA? What happened to our conversation regarding retaking the standardized testing? Is there after school assistance available? Tutoring during WIN period? What are the options available?"

25. By December 2022, Gorham had received repeated parental communications describing John's continuing difficulties with organization, independent assignment completion, academic engagement, and behavioral regulation, despite substantial assistance at home. His parents had specifically requested additional academic support, guidance counseling, and information about available school interventions.

26. The GMS discipline log lists John as having received another detention for disrespectful conduct toward a teacher in early January 2023. That same week, GMS suspended John from school after he took and shared photographs of a peer using the bathroom. In early February 2023, GMS disciplined John for making prank calls to the parent of another student. He also was disciplined in March 2023 for using abusive language in class. These incidents occurred after GMS had documented that John's behavioral difficulties were not improving with intervention and after his parents had repeatedly sought assistance with his academic and behavioral struggles. Despite this continuing pattern, Gorham did not refer John for an evaluation to determine whether he required special education.

27. At around that same time, John engaged in a series of insulting texts with his mother, as referenced in an email dated January 10, 2023. His insults included "I hate you so much making me retake this useless ass test," "You ruined

my day for a test that nobody cares about," and "I hate you so much." He also texted her to "Go [f-ing] die." His parents asked Gorham: "What do we do from here? Should we be putting John in counseling? Should we hire a tutor? What special assistance from the school is available to help him academically?"

28. By January 2023, Gorham had received direct communications from the Does documenting John's persistent academic difficulties and escalating behavioral concerns, and asking questions about John's emotional functioning. The parents expressly sought guidance regarding counseling, tutoring, and special academic assistance, yet Gorham did not initiate an evaluation to determine whether John had a disability requiring special education.

29. John's parents placed him in private counseling midway through eighth grade. At the time, as John's mother reported, he was upset at both the school and his parents' attempts to provide assistance. They sought counseling through the Family Center of Maine to address John's getting into trouble in school, not listening to rules, excessive sleep, low motivation, tearful/crying spells, and panic. John was struggling to get out of bed for school and was directing hateful remarks to his mother when she tried to help him get ready.

30. Contrary to his later false claims about parental abuse, John reported to the counselor that his relationship with his parents was "pretty good" and that they "support me in sports and other stuff." He later reported to another Family Center counselor that he had had "a healthy, happy upbringing." John's mother made clear

in her hearing testimony that there had been no parental abuse, noting instead that, at the time he made this reckless allegation, John was “very angry at us.”

31. Throughout eighth grade, John’s behavioral difficulties continued. His parents regularly monitored Gorham’s Infinite Campus portal and intervened to help him complete and submit assignments because he continued to struggle with managing his academic responsibilities independently. Despite this substantial parental involvement, John continued to experience academic and behavioral difficulties.

32. John’s father again emailed the eighth grade teacher in May 2023 seeking guidance: “I am curious what you think we should do to help [John]. We are constantly on him about his homework. It feels like he is falling backwards and does not want to take responsibility for his homework.” His follow-up e-mail reiterated: “We just don’t know what to do . . . .”

33. John’s continuing academic difficulties were also documented by GMS personnel. An ELA teacher reported that John “struggled to focus in ELA this week, and did not often respond to attempts to redirect him to classwork,’ resulting in ‘[v]ery little work completion.” Despite the parents’ repeated requests for assistance and the school’s own observations of continuing difficulties with attention and academic performance, GMS did not refer John for a special education evaluation or make reference to any potential disabilities that could be influencing John’s school issues and behaviors.

34. When John missed an assigned detention in June 2023, his father corresponded with the assistant principal: “As I shared on the phone, we just want to get through the school year. We feel absolutely defeated as parents.” Despite John’s continuing academic and behavioral struggles, no one from GMS referred him for evaluation of a potential disability.

35. During the summer before high school, John resumed private counseling with a new counselor at the Family Center of Maine.

36. At the start of ninth grade (2023-2024), John’s parents again tried to manage his academic work by communicating with his teachers and logging into Google Classroom. They urged him to complete the work and submit it on time. As the GHS school counselor confirmed, however, there was no communication between the staff at GMS and the staff at GHS concerning John’s potential need for services or interventions upon his transition to ninth grade. As a result, he started the ninth grade without a support plan.

37. In September 2023, John’s mother found a supply of vapes in his closet. He provided monosyllabic responses and avoided eye contact when asked about this behavior. John threw the backpack containing the vapes in his mother’s face, called her a “horrible mother,” and slammed the door to his room.

38. John joined the GHS football team but drew the ire of the football coach in October due to his behavior: “Today John was involved in an incident where he was goofing off in the locker room and another player ended up needing emergency medical attention due to his and others’ actions.”

39. John's parents contacted GHS with concerns about his grades and school behaviors at the end of October 2023. They e-mailed John's science and Spanish teachers about his failing grades of 64 and 69, respectively, as the quarter closed, and raised concerns regarding numerous missing assignments. John's science teacher documented difficulties with his academic performance and submitted a request for intervention, noting that she was "a little frustrated" with John. On or about October 30, 2023, GHS referred John for a general education "response to intervention" ("RTI") plan following concerns raised by both his teachers and his parents about his failure to complete academic work. Despite these documented concerns and the continuation of difficulties first observed in middle school, Gorham failed to initiate an evaluation to determine whether John had a disability that would qualify him for special education. John also received detention in early November for a cell phone violation in science class.

40. GHS's instructional strategist developed an RTI plan for John in early November 2023. This six-week plan, although not shared with the family, called for communicating with John's parents about work completion and checking the Infinite Campus electronic portal with John during his study hall. At the time, John was "failing Earth Space Science and Spanish," was "disruptive in Spanish, off-task, [and trying] to distract students."

41. John's parents remained concerned with his "continuation of minimal achievement since middle school" and believed that he needed "significant help to

improve." During ninth grade, they were providing even more 1:1 help, but his emotional dysregulation ramped up as tensions around work completion increased.

42. The ninth-grade Intervention Plan expressly identified two areas of concern requiring intervention: (1) John's executive-functioning difficulties and (2) his social-emotional needs. Although Gorham identified both areas, its documented interventions focused primarily on executive functioning, including organization, assignment completion, and remaining on task. Gorham produced no documented individualized social-emotional goals, no records demonstrating the implementation of specific social-emotional interventions, and no progress-monitoring data establishing whether John's identified social-emotional difficulties improved. The available intervention records do not establish what targeted social-emotional supports were provided or whether those supports were effective.

43. John's school counselor testified that the District's RTI progress information consisted principally of grades, attendance, and anecdotal observations. The GHS "RAM Lab" study hall teacher testified that she maintained an RTI notebook containing information concerning John's executive-functioning difficulties, but Gorham failed to produce that notebook in the administrative proceedings. The available records do not provide a full contemporaneous account of the general education interventions implemented, the frequency and duration of those interventions, or objective progress-monitoring data demonstrating whether John made meaningful improvement in his identified executive-functioning and social-emotional areas of need.

44. When John's study hall teacher wrote to his Spanish teacher that John was off task and watching sports videos during study hall, the Spanish teacher agreed this was an issue: "Thank you! I struggle to get him to do work in class." His math teacher agreed, explaining in November that "[i]n class, John struggles with on-task behavior."

45. John's father emailed Trisha Cherry, John's school counselor at GHS, in mid-November: "My wife and I would like an update on the intervention plan for our son [John Doe]. We would also like to talk about having a meeting with [John], you, his teachers, and us" as "it looks like his grades and work completion are actually going backwards . . . ."

46. Thereafter, GHS assistant principal, Marc Sawyer, became involved in John's case, collecting overdue assignments (from John's math, Spanish, world history, and English classes) to send to the Parents for completion over Thanksgiving break. Mr. Sawyer then communicated with staff to monitor John's work completion.

47. In early December 2023, John continued to have a failing grade in English and reported that he was being bullied. He was subsequently found in possession of a marijuana vape pen at school and received a suspension, which was reduced in connection with his agreement to participate in sessions with a school social worker. Although the District identified dates on which John met with the school social worker and school counselor, Gorham represented that it has no substantive records documenting these sessions.

48. John's parents received no reports describing the subjects addressed, interventions provided, or progress observed during the alleged social work and counseling meetings. The available records do not establish what academic, behavioral, or social-emotional concerns were addressed or whether these services produced meaningful improvement. Despite John's continuing difficulties and the involvement of school counseling personnel, neither the school social worker nor the school counselor initiated a referral for a special education evaluation.

49. In December 2023, John's father told the assistant principal that John was "very upset, defensive, and did not want to engage in any discussion. He is extremely frustrated and essentially wants us to leave him alone. . . . I still think he is overwhelmed with organization, prioritization, executive function." John's indoor track coach then became involved in an attempt to help John stay on the team. He met with John and one of his teachers to stress the need for good behavior and work completion.

50. As the winter holiday break approached, John remained behind in multiple classes, prompting his parents to request updated lists of incomplete assignments from the assistant principal and to communicate with his indoor track coach. Despite Gorham's existing RTI plan, substantial responsibility for helping John complete overdue academic work continued to fall upon his parents. During the holiday break, they provided direct assistance to help him catch up on missing assignments. Even when John completed this work with their assistance, he failed to submit some of the completed assignments, further demonstrating his continuing

difficulties with independent organization, task completion, and follow-through. His parents expressed significant frustration and concern over his inability to manage these responsibilities independently.

51. In early January 2024, John left the track team rather than meet work completion expectations. John told his counselor "that he has been having a tough year and is struggling with emotions. [John] endorsed feeling overwhelmed, increased pressure, and sadness when at home."

52. In early January 2024, John's mother "found two notes in [John's] laundry alluding to suicide and experiencing suicidal ideation from a month ago." His mother recalls screaming and crying when she made this discovery. She made John's outside counselor aware of what she had found.

53. In his counseling session on January 9, 2024, John "shared that he has had thoughts of suicide for years now." He acknowledged having such thoughts multiple times per week and said the thoughts could last for hours. Given his acknowledgement of suicidal ideation, the counselor created a safety plan: "[John] appears to be using therapeutic space to process through symptoms of depression. [John] previously presented as guarded and did not share thoughts of suicide with writer."

54. John experienced escalating sadness and anger. He told his mother that he could not handle school and did not want to go. He had panic attacks in the car on the ride to school, telling his mother to "F***-off" and that he hated her guts and wanted her to die. On one occasion, he became so angry that he smashed the center

console of her car. On another occasion, he put his knuckles to his mother's face and pushed her head toward the car window.

55. In January 2024, John's parents emailed Ms. Cherry, the GHS school counselor, requesting assistance concerning John's worsening mental-health difficulties and their impact on his education. They wrote: "We are actively working with his counselor at the Family Center of Maine and his Primary Care Provider (PCP) at Martin's Point in Gorham. We have discovered through conversation with him and his support, that the academic rigors of school are contributing to his feelings. He has been diagnosed with depression and we are working through a treatment plan with his counselor and his PCP." Ms. Cherry acknowledged the communication and expressed willingness to work collaboratively with the parents. Despite receiving this information, Gorham did not initiate a special education evaluation to determine whether John's persistent academic, behavioral, and emotional difficulties warranted special education services.

56. The email from John's parents also put Gorham on notice of his use of substances: "John is also addressing substance abuse with his counselor and from our conversations with her and his PCP we believe he was/is most likely self-medicating due to the underlying depression. I wish to share this so you have context of the previous disciplinary actions at school." They specifically asked for assistance in light of his diagnosis and continuing difficulties at the high school: "We are interested in working with you and his teachers (or other resources) to get appropriate supports in place for John. What we have also learned [is] that micro-

managing his school work does not work. This is both at home and at school. In our conversations with his counselor, he needs positive reinforcement, not the traditional behavior/punishment that is normally associated with children."

57. By January 2024, Gorham had received direct written notice that John (1) had been diagnosed with depression, (2) was receiving treatment from a mental-health counselor and primary care provider, (3) was experiencing emotional difficulties that his parents believed were aggravated by the academic demands of school, and (4) was believed by his parents and treatment providers to be using substances to cope with his depression. His parents expressly requested assistance in identifying and implementing appropriate educational supports, and they informed Gorham that traditional approaches to managing his schoolwork and behavior were proving ineffective. Ms. Cherry acknowledged these disclosures and offered to work collaboratively with the family. Despite this information, together with the District's preexisting knowledge of John's persistent academic, organizational, and behavioral difficulties, Gorham did not initiate an evaluation to determine whether he required special education.

58. The following week, three peers carried out a targeted assault on John in the school bathroom, which led to an altercation overheard by a teacher in one of the stalls. This resulted in John receiving another out-of-school suspension. As confirmed by his mother's testimony, the attack deeply upset John and left him fearful at GHS. John had difficulty returning to the high school following this

incident. GHS added another "supported study hall" to John's schedule but did not refer him for evaluation.

59. Upon John's return to GHS in late January, John's father emailed all his teachers to let them know John was "suffering from depression," which he was "working through that with his primary care physician and his counselors." John's counseling records from this time frame all reference his "constricted affect" and describe that he "was tearful throughout session and avoided eye contact."

60. Things did not improve for John during the second semester of ninth grade. On February 29, 2024, for instance, a teacher in the RAM Lab study hall wrote, "John Doe isn't doing anything in RAM. What is his story?" His parents continued to be open with GHS, explaining that he was struggling with focus and had a blow-up at home.

61. Ms. Cherry encouraged John's parents to discuss his issues during the mid-March parent-teacher conferences, which they did. John's parents remained concerned that "his grades are dropping really fast and he is now showing failing in English and Math. . . . His grades have all fallen significantly since his progress report and I very much believe that he is lacking any organizational/executive skills to be successful." At around this time, John's parents also had been forced to remove his bedroom door to discourage him from vaping after school.

62. Also in mid-March 2024, Ms. Cherry received a complaint about John from a female peer, alleging that "He's been calling me inappropriate names and sexual stuff. Pretty sure a lot of people hate him and he likes to annoy me until I

say something." Ms. Cherry confirmed that she reported this complaint against John to GHS administration, but she still did not refer John for evaluation.

63. Although John and his parents were not aware of this at the time, on March 18, 2024, Keith Leonetti, a teacher from the RAM Lab, emailed his colleague, Luci Bowers, writing, "Can we divest ourselves of [John Doe]?" Ms. Bowers responded: "He was a Brian [Principal Jandreau] request . . . we're stuck with him."

64. John's school-related behavioral and emotional difficulties continued at home during the spring semester. One incident involved two female peers harassing John and alleging sexual misconduct that John and his family disputed. John became extremely upset over the incident and responded by forcefully striking and denting the airbag area of his mother's vehicle. This incident reflected the continuing intensity of his emotional reactions to conflicts involving school peers.

65. Following the March 2024 parent-teacher conferences, John's parents emailed Principal Jandreau and Ms. Cherry on March 25, 2024, listing the themes they had discussed with his teachers, which included John not using "his time in class to complete assignments" and his "continu[ing] to not turn in work on time." They wrote that they were "looking for advice about a 504 or IEP plan," because "the biggest challenges seem to focus on executive functioning. He is unorganized, unable to keep track of what is due and when, and is a general slob with any handwritten work. We would like to discuss, we just don't know what to do. . . ."

66. Principal Jandreau replied that he was "currently at a conference in RI," but would "connect with Trisha" Cherry upon his "return later this week and then

get back to you." But Principal Jandreau never got in touch with John's parents after his return from the conference. Instead, Ms. Cherry emailed them on April 5, 2024, asserting that the District's existing RTI interventions were sufficiently effective and declining any need for a special education evaluation: "The team does feel that the RTI interventions, especially the addition of RAM Lab study halls to help with executive functioning are helping and we do not have data to support a referral for special education services (IEP) at this time." Although Ms. Cherry advised the parents that they could initiate an IEP or 504 referral themselves, Gorham opted not to initiate an evaluation despite its knowledge of John's diagnosed depression, persistent executive-functioning difficulties, declining academic performance, and continuing behavioral and emotional concerns.

67. John returned to GHS for tenth grade in 2024-2025. By this point, he was telling his outside counselor that he was "using THC carts regularly."

68. By early December, John again was behind in his academic classes. One of his RAM Lab teachers emailed Ms. Bowers to indicate that John had "a lot of missing work which we discuss at the beginning of every class. I am worried the group in period 6 is too distracting for him, but that said I think he would be distracted anywhere and with anyone. He does have the ability to get work done but it is mostly when I am next to him guiding him every step of the way. . . . After looking at all their grades, John is the one struggling the most." This contemporaneous reporting from the RAM Lab indicates that John was not gaining any independence with his executive function skills.

69. Despite this evidence, Gorham continued not to refer John for evaluation. Gorham never produced objective progress-monitoring data demonstrating meaningful improvement in John's identified executive-functioning or social-emotional needs. Nor did Gorham produce records establishing what specific social-emotional interventions had been implemented or whether those interventions were effective. Gorham nevertheless represented to John's parents that its RTI interventions were helping him and that there was no data supporting a special education referral. The parents continued to trust Gorham's professional judgment and rely upon its representations concerning the adequacy of the interventions being provided.

70. John continued to receive detentions for cell phone violations. His parents again corresponded with the principal and assistant principal in December 2024 to discuss John's admission that he had been vaping in the bathrooms at school and his desire to be done with high school. They shared his worries about social matters at school, such as being bullied or viewed as a "snitch" by his classmates. They explained that John continued to see a counselor at the Family Center of Maine and had mostly lost access to his cell phone. They continued to be forthcoming: "I do wish to be transparent and hope we can all continue to partner to help John succeed. Please let us know if you would like to discuss."

71. During tenth grade, John continued to experience the social-emotional difficulties that had arisen during ninth grade. In late January 2025, for instance, GHS suspended John for two days after he tried to instigate a fight with a peer

concerning a social media post by "pushing the other student multiple times." His academic issues continued as well. During the mid-March 2025 parent-teacher conferences, John's parents again learned "that he has many missing assignments in some of his classes." They reached out to his teachers in an attempt to help John complete and submit overdue classwork. John barely received passing grades (73 is the required minimum) in two of his classes.

72. In May 2025, John became involved in an incident during RAM Lab, during which he was confronted by peers and told, 'That's why your girlfriend cheated on you and moved out of state and no one f**** likes you." His parents also discovered that he had been using THC cartridges. In early June 2025, John was involved in another serious conflict with two peers in a school bathroom, during which the peers verbally berated and slapped him. Following this incident, John expressed that he did not feel safe returning to school. His parents were "immensely concerned about [John] passing his classes."

73. John's father spoke with Assistant Principal Sawyer about John's anxiety in returning to GHS, explaining that John had been able to attain passing grades only because of 1:1 assistance provided by his parents and some of his teachers. When John decided to return to school, his parents indicated that they would "continue to stay on him about his work and will email all of his teachers as well." Rather than refer John for evaluation, the assistant principal merely asked the GHS teachers to "keep an eye on him."

74. Unfortunately, John's condition deteriorated in the days that followed. His counseling note from June 11 references a discussion of "substance use, anger, and his relationship with his parents" and notes that John was "angry (as evidenced by client report and tone of voice), tearful, and dysphoric (as evidenced by slouching in his chair, minimal eye contact, frowning)." His behavior reached a crisis on June 15, 2025, when he bolted from home and ran away in response to parental limitations. Law enforcement became involved and John ultimately was discovered at a friend's home and taken to the hospital in Bridgton for mental health assessment.

75. From the Bridgton hospital, John was admitted to The Ridge RTC ("The Ridge"), a residential treatment center for short-term care located in Morrill. He leveled untrue allegations against his parents, including allegations of abuse against his father, as noted in the Biopsychosocial Assessment prepared by his principal counselor, Peter Lakis. His diagnoses on admission were Major Depressive Disorder, Anxiety, Substance Use Disorder, and Oppositional Defiant Disorder. John remained at The Ridge for about six weeks of residential treatment.

76. Although Mr. Lakis reported John's subjective comments alleging abuse by his father, he explained that John was very angry at the time of admission, throwing objects and hurling expletives. Mr. Lakis noted that it is not uncommon for angry and highly dysregulated individuals like John, who are in the throes of mental illness, to dramatize and be hyperbolic in describing events while

communicating their anger. He further explained that any issues in the family household were not the reason why John was struggling in June 2025.

77. While John was receiving residential treatment at The Ridge, his parents held a 45-minute meeting with Gorham Superintendent Heather Perry on June 30, 2025, to discuss his situation. They informed Superintendent Perry of John's residential mental-health treatment, longstanding academic and behavioral difficulties, escalating mental-health needs, substance abuse, and apparent access to drugs at GHS. They also discussed John's experiences with peer conflicts, his difficulties participating in school athletics, and their concerns regarding the school's response to his developing problems.

78. During the meeting, Superintendent Perry took contemporaneous handwritten notes documenting the parental concerns, including specific references to "Mental health/anxiety," substance use, peer conflicts, and school-related difficulties. Superintendent Perry separately recorded "No I.E.P." and "No 504" in her notes, expressly documenting that John had neither an Individualized Education Program nor a Section 504 plan at the time. Despite her direct knowledge of John's serious mental-health difficulties and residential placement, together with Gorham's longstanding knowledge of his academic and executive-functioning problems, the Superintendent did not initiate an IDEA evaluation or develop a plan to determine and address his potential disability-related educational needs.

79. John began at The Ridge exhibiting anger, intransigence, and resistance to therapy, but Mr. Lakis and other staff at The Ridge were able to make therapeutic progress with him. During the June-July 2025 admission, The Ridge focused principally on improving John's mood and the prospect of successful family reunification.

80. As John's discharge from The Ridge approached in late July 2025, his mental health symptoms had improved. He promised to maintain sobriety after his return home. Following his discharge, John continued to engage in outpatient counseling sessions with Mr. Lakis, sometimes in person and sometimes virtually, focusing on "concerns related to substance use, mood instability, emotional dysregulation, and safety." John experienced "[f]luctuating stability, with intermittent progress followed by periods of escalation associated with psychosocial stressors and limited coping capacity." He continued to exhibit "symptoms consistent with a substance use disorder and co-occurring mood disturbance, including ambivalence toward change, difficulty sustaining harm-reduction efforts, and impaired judgment during periods of distress."

81. John began eleventh grade (2025-2026) with only two morning classes at GHS (English and Economics), after which he would drive himself to the Biddeford Regional Center of Technology for a manufacturing technology class. During this time, Mr. Lakis reported that John's "outpatient interventions . . . included motivational interviewing, psychoeducation, cognitive behavioral strategies, and harm-reduction approaches." As safety concerns "emerged during treatment" they

"were addressed through safety planning, increased monitoring, and family involvement in accordance with ethical and mandated reporting standards."

82. Unfortunately, John's functioning declined to the point that, by October 2025, Mr. Lakis contacted his parents about initiating another period of residential treatment to provide John with a tighter environment: "Given the pattern of escalation and relapse despite outpatient support, a residential level of care has been clinically indicated to provide structure, stabilization, and intensive support."

83. On October 28, 2025, John's parents informed Principal Jandreau that John required further substance-use treatment and that they were evaluating both inpatient and outpatient programs. They requested guidance concerning how another residential placement would affect his education at GHS and the Biddeford Regional Center of Technology. On October 30, 2025, the parents further informed the school counselor, principal, and assistant principal of John's anticipated readmission to The Ridge on November 5, 2025. Despite this renewed notice of serious mental-health and substance-use difficulties, together with the District's longstanding knowledge of John's academic and executive-functioning challenges, Gorham still failed to initiate a special education evaluation.

84. Before John's parents could place him at The Ridge, however, he attempted to end his life on the night of November 3, 2025, by overdosing on a large quantity of LSD. There also was evidence of self-harm as John had been cutting himself on his arms. After contacting his mother for assistance, John was treated at Maine Medical Center. On November 5, John's father contacted GHS and spoke

with GHS Principal Jandreau to report what had happened and to confirm that John was being transferred to The Ridge.

85. John's Biopsychosocial Assessment on readmission to The Ridge indicated that he was using "substances to fill emotional voids and will not accept support/help from his family. [John] will have hard time navigating sustainable sobriety, emotional stability, and healthy attachments." His counselor there confirmed that John reported suicidal intent in connection with his overdose and that, during his time at The Ridge, John was never permitted to go off campus due to the risks posed by his impulsivity and mental health challenges.

86. During his Initial Psychiatric Evaluation at The Ridge, John reported drinking alcohol and smoking cannabis "all day every day" and told the doctor "I wouldn't say I want to live." He admitted to using Zyn pouches, vapes, cigarettes, mushrooms, and acid, and said "that prior to this admission, he had purchased $200 worth of weed cartridges and vapes with the intention of sneaking them into the facility." The psychiatrist rated his insight as "limited" and judgment as "poor." She concluded that residential treatment was "medically necessary," noting his "ongoing psychiatric symptoms including depression and anxiety" and substance abuse. John was "at high risk for further medical complications and self-harm given his recent behavior, polysubstance use, and emotional dysregulation. He requires a 24/7 structured and supervised environment for psychiatric stabilization, detoxification, and to address the underlying drivers of his substance abuse, which cannot be effectively managed at a lower level of care."

87. On November 8, 2025, having received no substantive educational plan from Gorham following John's suicide attempt and admission to The Ridge, John's father emailed GHS administrators, teachers, and his school counselor, requesting assistance with his education and a formal Section 504 evaluation: "Given John's diagnoses and recent crisis, we are formally requesting a 504 evaluation to identify and document the accommodations he will need while in treatment and when he returns to school." They requested confirmation of the evaluation process, timeline, and scheduling. At that time, despite receiving adult assistance through the RAM Lab, John had a failing grade of 68 in Economics, in part because an assignment his parents understood he had worked on during RAM Lab had not been submitted. Although GHS later excused this missing work to award John a passing grade, the District did not commence the requested Section 504 evaluation. Instead, on November 10, 2025, Principal Jandreau informed the parents that the District's recommendation was to wait until John's treatment team determined that he was sufficiently stable to begin the evaluation process. Gorham explained that it could not accurately assess the impact of John's diagnosed conditions on learning while he was receiving acute treatment. Despite the parents' formal evaluation request, and John's documented diagnoses, serious mental-health crisis, and longstanding educational difficulties, Gorham affirmatively deferred the requested evaluation.

88. During John's second admission at The Ridge, his parents explored potential next steps. This included a neuropsychological evaluation and exploration of potential educational placements following his short-term treatment at The

Ridge. The Ridge's mid-November psychiatric note specifies that John "continues to require residential level of care to manage symptoms of depression and to support remission from cannabis use disorder, including managing cravings." John continued to receive individual therapy three times per week, plus family therapy and participation in a recovery group.

89. Brittany A. Bomil, Psy.D., conducted John's neuropsychological evaluation. She diagnosed John with Major Depressive Disorder, moderate; ADHD, Combined Presentation, moderate; Alcohol Use Disorder, moderate, in early remission, in a controlled environment; and Cannabis Use Disorder, moderate, in early remission, in a controlled environment. Dr. Bomil explained that it is "notable that John often turns to substances when something negative occurs in his life" and that it "appears that substances are John's way of managing challenging emotions; therefore, he would benefit significantly from additional tools to help him regulate his emotions."

90. Dr. Bomil's neuropsychological evaluation identified significant attention and executive-functioning weaknesses associated with John's ADHD, affecting his ability to organize, initiate, sustain, and complete tasks independently. She also explained that children with ADHD frequently experience difficulties regulating their emotions. These clinical findings were consistent with the longstanding pattern documented in Gorham's own educational records, including difficulties initiating and completing assignments, poor organization, distractibility, inconsistent persistence, and a continuing need for adult prompting and redirection.

Dr. Bomil observed that John had substantial difficulty sustaining attention for extended periods and recommended interventions addressing his executive-functioning and emotional-regulation weaknesses, in addition to his mental-health and substance-use needs. Her findings provided further evidence that John's longstanding academic difficulties involved underlying neurodevelopmental impairments, rather than simply a lack of effort or motivation, and warranted consideration of whether he required specially designed instruction.

91. Dr. Bomil specifically recommended a therapeutic school program for John's next placement, "especially given his substance use, while he receives mental health treatment. A return to his regular school environment would place him at risk for ongoing use." She wrote that "the highest level of importance should be placed on stabilizing the substance use and underlying mental health features." She also explained that John requires regular access to individual counseling services "to specifically build coping and distress tolerance skills and a sense of support when faced with stressors that affect him most centrally while he is at school." Her recommendations contemplated an educational setting capable of addressing John's substance use and mental health needs while also targeting the attention and executive-function deficits resulting from his ADHD.

92. John's outpatient counselor, Mr. Lakis, agreed with the recommendation of a long-term residential educational placement for John, explaining that John requires a holistic learning environment invested in his safety and welfare, and which is capable of addressing his need for therapeutic intervention for depression

and anxiety, his substance use, and all his needs under the psychoeducational umbrella. The Ridge counselor also agreed that John, whom she described as being at a "fragile" and "pivotal" point in his life, required transition to a residential therapeutic boarding school placement. She explained that neither a partial hospitalization nor intensive outpatient treatment model would suffice given John's issues, prognosis, and risks.

93. On December 19, 2025, John's parents formally requested an IDEA special education evaluation, explaining: "It has become apparent to us that he will require a therapeutic special education placement upon his discharge from the residential treatment center next month." They subsequently completed the District's special education referral form, identifying concerns involving adaptive functioning, following directions, task initiation and completion, attention and concentration, planning and organization, impulsivity, emotional regulation, social functioning, and persistence of effort. The parental referral also described John's depression, recent suicide attempt, substance-use difficulties, and repeated residential treatment. Although Gorham had previously received substantial information concerning these difficulties, including the parents' express requests for educational assistance, the December 2025 referral was the first formal IDEA referral initiated in John's case.

94. John was scheduled for discharge from The Ridge in early January 2026. Following Dr. Bomil's recommendation for a therapeutic educational environment, and with assistance from treatment professionals and educational consultants, his

parents explored residential programs capable of combining continued academic instruction with intensive mental-health and substance-use treatment. They ultimately identified Align Adolescent Recovery in Arizona, which operates San Pedro Valley Academy ("SPVA") as its academic program. Align provides residential therapeutic treatment for adolescents experiencing co-occurring mental-health and substance-use difficulties, while SPVA provides academic instruction within the residential setting. Align is approved by the Arizona Department of Education as a nonpublic residential treatment center, and SPVA's academic program is accredited by Cognia. Although Align/SPVA is not approved by Arizona as a private special education school, the parents selected the program because they believed its integrated therapeutic and academic services could address John's combined clinical, educational, and executive-functioning needs while permitting him to continue progressing toward high school graduation.

95. On December 23, 2025, John's parents provided Gorham with reimbursement notice for their anticipated unilateral placement of John. The Ridge discharged John on January 8, 2026, and he transferred to Align/SPVA. The Ridge's discharge summary indicates that John required a structured residential level of care focusing on substance use recovery at a therapeutic boarding school that integrates instruction and clinical treatment.

96. Gorham scheduled an initial IEP Team meeting for John on January 23, 2026. Over a week before that meeting, John's parents shared Dr. Bomil's report and The Ridge's discharge summary with Gorham.

97. On January 23, 2026, at John's initial IEP Team meeting, Gorham claimed that it required additional assessments to determine John's eligibility for special education. The IEP Team agreed to proceed with a psychological evaluation, academic assessment, and classroom observation to investigate suspected disabilities, including Emotional Disability, Other Health Impairment associated with ADHD, and Specific Learning Disability. Despite this agreement, Gorham did not provide the parents with a consent-to-evaluate form at the meeting. Ms. Hamblen contended that John's residential placement in Arizona raised questions concerning Gorham's responsibility for conducting an evaluation. Following the meeting, John's father expressly requested that Gorham proceed with the evaluation without delay. Ms. Hamblen responded by asking when John would return to Maine and be accessible to Gorham's evaluators.

98. John's parents signed the consent to evaluate on January 28, 2026. They also signed a release so Gorham could communicate with Align/SPVA. Their email suggested a variety of approaches for evaluating John, despite his placement in Arizona, including using qualified professionals in Arizona and/or sending Gorham's preferred evaluator to Arizona. Ms. Hamblen declined these options and insisted that John's parents make him available for evaluation in Maine, despite the fact that John's out-of-state "placement was made in consultation with his treatment team following a suicide attempt and ongoing mental-health and substance-use concerns. His current program is a direct result of disability-related needs, and he is not clinically able to return to Maine at this time."

99. John's parents have never refused to have Gorham evaluate him. They have signed consent and requested releases, proposed the use of qualified Arizona evaluators, suggested that Gorham send an evaluator to Arizona, and provided medical documentation explaining why John is unable to return to Maine to be evaluated.

100. Gorham refused to provide Prior Written Notice documenting its decision not to proceed with John's evaluation by any of the means suggested by his parents. On January 29, 2026, Ms. Hamblen wrote that Gorham had no obligation to send an evaluator to Arizona or to contract with an Arizona evaluator. On January 30, the parents again requested Prior Written Notice documenting the District's refusal. Ms. Hamblen expressly declined, stating: "We are not refusing to follow the referral process, so a written notice would not be required at this time."

101. By the time of John's second IEP Team meeting on April 9, 2026, which occurred on the 45th and final school day of the evaluation period, Gorham had neither completed the assessments necessary to determine John's eligibility for special education nor reached an eligibility determination. Although Gorham's psychologist, Dr. Rollins, had conducted interviews with John's parents and certain personnel from GHS and Align/SPVA, she had not completed any direct assessments of John. Gorham continued to maintain that the evaluations could not be completed because John remained in residential treatment in Arizona and was unavailable for testing in Maine, despite the parents' written consent to evaluation, their offers to make John available for assessment in Arizona, and medical

documentation explaining why travel to Maine was clinically inadvisable. By April 9, 2026, therefore, Gorham had neither completed the agreed-upon evaluation nor provided the requested formal explanation of its refusal to implement alternative testing arrangements.

102. Dr. Rollins's interview notes revealed that several GHS personnel had suspected John of substance use during his enrollment without reporting those concerns to school administrators.

103. John's personal physician and his providers at Align have confirmed the medical necessity of his remaining in his program at Align and not traveling to Maine. The PCP wrote: "I am in full support of John's participation in this program," but he "will not be able to travel back to Maine while in this program and therefore will not be able to participate in psychoeducational testing locally," while explaining that this placement "is medically necessary for the treatment of his diagnosed mental health conditions and substance use disorder." Similarly, Align's clinical director and treating therapist wrote that his "removal from his current structured therapeutic placement for in-person testing in Maine would be clinically inadvisable at this time. Such travel presents a significant risk of destabilization and relapse that could undermine the progress he has achieved in treatment."

104. John has been at Align/SPVA since the second week of January 2026. Early in his tenure at Align/SPVA, John struggled and engaged in significant interfering behaviors, including participation in a group elopement from campus on

January 27, 2026. Afterwards, however, John began to buy into the program and show increased insight into the work he needed to do.

105. John has made substantial therapeutic progress at Align/SPVA, although, as his counselor explained, he has "needed every ounce of every resource we have." He has participated extensively in equine-assisted therapy, developed more positive peer relationships, and demonstrated increasing leadership and insight into his emotional and behavioral difficulties. His family has also participated in successful visits and family programming. Although John has experienced setbacks during treatment, Align has provided continued therapeutic structure, supervision, and individualized clinical support in response to those difficulties. At the same time, John has continued his academic development through SPVA, receiving instruction and individualized teacher assistance with coursework, assignment completion, and organization. His academic program has allowed him to continue earning high school credits while receiving residential mental-health and substance-use treatment. The combination of structured therapeutic services and individualized academic assistance has enabled John to continue progressing toward graduation while addressing difficulties that had interfered with his educational functioning at GHS.

106. In July 2026, Dr. Bomil conducted a follow-up consultation, interviewing John, his parents, and his staff at Align/SPVA to assess the appropriateness of his current program and placement given her prior recommendations. Through her follow-up work, Dr. Bomil was able to confirm her diagnoses from the December

2025 evaluation and make further recommendations. She continued to "recommend treatment in a setting such as the one at Align so that John  can continue to work towards sobriety, while also continuing to treat underlying mental health conditions and supporting his underlying neurodevelopmental features (ADHD)."

107. John's parents have continued working with Align/SPVA to support his therapeutic progress and completion of the academic coursework necessary to obtain his high school diploma. Through SPVA, John has continued receiving academic instruction and individualized assistance while participating in residential therapeutic treatment. His parents have also pursued available avenues for recognition of his completed coursework and graduation requirements. Their educational objective remains for John to complete his secondary education and successfully transition from residential treatment.

## Due Process Hearing

108. A hearing officer appointed by the Maine Department of Education held a hearing on the Does' due process complaint on July 15, 16, 17, 21 and 22, 2026.

109. Through their due process complaint, the Does sought reimbursement for the costs associated with John's unilateral placement at Align/SPVA, arguing that Gorham had violated its obligation to provide John with a free appropriate public education by (1) shirking its Child Find obligations under the IDEA by never referring him for evaluation, and (2) violating its IDEA obligation to evaluate John after they specifically requested such an evaluation in December 2025.

110. Following the parties' prehearing conference on June 22, 2026, the hearing officer entered a legally erroneous ruling refusing to hear evidence on or determine the merits of one of the issues posed by the Does' due process complaint: whether John is a student eligible for special education under the IDEA. There was and remains no competent legal basis for the hearing officer's refusal to hear evidence on and determine this critical legal issue.

111. In another prehearing order, dated June 26, 2026 (and later confirmed on July 3, 2026), the hearing officer committed serious legal error in applying the IDEA's limitations provisions to restrict the Does' Child Find claim by dismissing violations that occurred prior to January 11, 2024, despite specifically concluding that the statutory trigger date for limitations purposes (when the parents knew or should have known about the bases for their claim) is April 5, 2024. The IDEA permits parents two years from this trigger date to file their due process complaint, and the Does complied, rendering the hearing officer's contrary order legally erroneous.

112. In another prehearing order, dated July 6, 2026, the hearing officer erroneously restricted the scope of subpoenas served on two non-employee psychologists called by Gorham as hearing witnesses. This ruling, which exempted the psychologists from disclosing their written communications with Gorham's counsel—purportedly due to the attorney-client privilege doctrine—also was the product of legal error and hamstrung the Does in discovering information of

significance for the presentation of their claims. The records sought in the subpoena are not protected by the attorney-client privilege.

113. The hearing officer also improperly granted a motion *in limine* filed by Gorham, which erroneously restricted the scope of hearing testimony permitted from John's counselor, Peter Lakis, due to a purported but non-existent discovery violation. This legally erroneous order also prejudiced the Does in presenting the full scope of evidence in support of their claims.

114. Following the hearing, the hearing officer issued a decision on the merits of the issues she chose to hear, dated August 21, 2026. That order was both factually and legally erroneous in concluding that (i) Gorham did not violate its Child Find obligations under the IDEA to evaluate, identify, and provide specialized programming for John; (ii) Gorham's obligation to evaluate John was excused pursuant to 34 C.F.R. § 300.301(d)(1); and (iii) Gorham has no responsibility for any costs incurred by the Does for John's unilateral placement at Align/SPVA.

## COUNT I
**(Review of Due Process Determination: IDEA and 20-A M.R.S.A. § 7207-B)**

115. Plaintiffs repeat the allegations contained in paragraphs 1-114.

116. Federal and state special education laws authorize the Court to conduct judicial review of IDEA administrative decisions and "to grant such relief as the court determines is appropriate." This authority includes the power to reverse or vacate erroneous portions of a hearing officer's order.

117. For the reasons outlined above, the hearing officer erred as a matter of law and fact in ruling against the Does on each of the enumerated prehearing motions and by ruling on the merits that (i) Gorham did not violate its Child Find obligations under the IDEA to evaluate, identify, and provide specialized programming for John; (ii) Gorham's obligation to evaluate John was excused pursuant to 34 C.F.R. § 300.301(d)(1); and (iii) Gorham has no responsibility for any costs incurred by the Does for John's unilateral placement at Align/SPVA, in part due to the hearing officer's improper determination that Align/SPVA is not an appropriate placement for John.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor against Defendant Gorham School District, and specifically to provide them with the following relief:

a) to reverse and/or vacate the hearing officer's erroneous prehearing orders pertaining to (1) the issue of determining John's IDEA eligibility, (2) the limitations period governing the Does' Child Find claim, (3) the scope of the subpoenas served on Gorham's psychologist witnesses, and (4) the scope of the testimony permitted by John's therapeutic counselor;

b) to reverse and/or vacate the hearing officer's erroneous hearing order on the merits;

c) to determine that Gorham did violate its Child Find obligations under the IDEA to evaluate, identify, and provide specialized

programming for John within the proper statutory limitations period arising from the "knew or should have known" date of April 5, 2024;

d) to determine that Gorham's obligation to evaluate John was not excused pursuant to 34 C.F.R. § 300.301(d)(1), and that Gorham failed to satisfy this obligation;

e) to determine that Gorham is responsible for reimbursing the Does for the costs they have incurred in connection with John's appropriate unilateral placement at Align/SPVA, including the private evaluation expenses they have incurred, with prejudgment interest; and

f) to award the Does reimbursement of their costs, including their reasonable attorney's fees and litigation expenses, and such further relief as the Court may deem just and proper.

Dated: November 18, 2026

Respectfully submitted,

*/s/ Richard L. O'Meara*

Richard L. O'Meara
*E-mail: romeara@mpmlaw.com*

Counsel for Plaintiffs

MURRAY, PLUMB & MURRAY
75 Pearl Street, P.O. Box 9785
Portland, ME 04104-5085
(207) 773-5651